Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

FILED

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

2025 OCT 29 ℗ 3: 53

Alexandria Division

Case No. 1:25cv 1896

*(to be filled in by the Clerk's Office)*

Natasha Nicole Bennett

*Plaintiff(s)*

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

Jury Trial: *(check one)* ☒ Yes ☐ No

**-v-**

Navy Federal Credit Union

*Defendant(s)*

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

## COMPLAINT FOR A CIVIL CASE

**I.    The Parties to This Complaint**

**A.    The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Natasha Nicole Bennett |
| Street Address | 6301 Stevenson Ave, Unit 602 |
| City and County | Alexandria (Independent City) |
| State and Zip Code | VA 22304 |
| Telephone Number | (337) 353 - 7503 |
| E-mail Address | nbennett001@yahoo.com |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

**B.** **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Navy Federal Credit Union |
| Job or Title *(if known)* | |
| Street Address | 820 Follin Lane SE |
| City and County | Vienna, Fairfax County |
| State and Zip Code | VA 22180 |
| Telephone Number | (850) 751-7303 |
| E-mail Address *(if known)* | shelley_young@navyfederal.org |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

E-mail Address *(if known)*  _____

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question          ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

[See attached Complaint w/ 13 Exhibits, 86 pages - incorporated by reference, "Jurisdiction and Venue" (Bennett v. Navy  Federal Credit Union)]

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

a.    If the plaintiff is an individual

The plaintiff, *(name)* _____ , is a citizen of the State of *(name)* _____ .

b.    If the plaintiff is a corporation

The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ ,

and has its principal place of business in the State of *(name)* _____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

The defendant, *(name)* _____ , is a citizen of

the State of *(name)* _____ . Or is a citizen of

*(foreign nation)* _____

b.    If the defendant is a corporation

The defendant, *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

Exceeds $75,000, inclusive of actual, compensatory, statutory, treble, and punitive damages.

[See attached Complaint w/ 13 Exhibits, 86 pages - incorporated by reference, "Prayer for Relief" (Bennett v. Navy Federal Credit Union)]

## III.  Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

[See attached Complaint w/ 13 Exhibits, 86 pages - incorporated by reference (Bennett v. Navy Federal Credit Union)]

## IV.  Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

[See attached Complaint w/ 13 Exhibits, 86 pages - incorporated by reference, "Prayer for Relief" (Bennett v. Navy  Federal Credit Union)]

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case−related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        28 October 2025

Signature of Plaintiff
Printed Name of Plaintiff        Natasha Nicole Bennett

### B.    For Attorneys

Date of signing:

Signature of Attorney
Printed Name of Attorney
Bar Number
Name of Law Firm
Street Address
State and Zip Code
Telephone Number
E-mail Address

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| NATASHA NICOLE BENNETT, | ) | |
| | ) | Civil Action No._____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT &** |
| NAVY FEDERAL CREDIT UNION, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |
| | ) | |

### NATURE OF THE ACTION

1.      Plaintiff, Natasha Nicole Bennett, Major, U.S. Army ("Plaintiff"), brings this civil action in her personal capacity against Navy Federal Credit Union ("NFCU" or "Defendant") for violations of federal and Virginia law arising from Defendant's misapplication of Department of Veterans Affairs ("VA") loan policy, misrepresentation of federal lending requirements, and resulting financial harm.

2.      Defendant unlawfully treated allowable VA closing costs as subject to the four-percent seller-concession cap, contrary to VA Pamphlet 26-7, Lender's Handbook ("VA Lender's Handbook"), and refused to correct the error after repeated notice. While under short-notice Permanent Change of Station ("PCS") military orders, and with no alternative housing available for her family, Plaintiff was forced to renegotiate her purchase contract. As a direct and proximate result of the Defendant's error, Plaintiff suffered the loss of $13,000 in negotiated seller credits, the financing of a $10,626 VA funding fee into the loan principal, and $384.21 in temporary-lodging expenses.

-1-

3.      Plaintiff seeks declaratory and monetary relief for Defendant's violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq.; the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq.; the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 et seq.; the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-196 et seq.; and Virginia common law, including fraud, misrepresentation, and breach of contract.

## JURISDICTION AND VENUE

4.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under RESPA (12 U.S.C. § 2601 et seq.), TILA (15 U.S.C. § 1601 et seq.), and ECOA (15 U.S.C. § 1691 et seq.).

5.      This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy as the federal claims.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendant conducts business here.

## PARTIES

7.      Plaintiff, Natasha N. Bennett, Major, U.S. Army, is a natural person and resident of Alexandria, Virginia.

8.      Defendant, Navy Federal Credit Union, is a federally chartered credit union headquartered in Vienna, Virginia, that originates and services mortgage loans in Virginia, including VA-guaranteed loans.

## FACTUAL ALLEGATIONS

### Plaintiff's Military Relocation and Purchase Contract

-2-

9.     All actions, statements, and omissions described herein were made by Defendant, acting by and through its authorized officers, employees, agents, and representatives, each of whom was acting within the course and scope of employment.

10.     On May 7, 2025, Plaintiff received short-notice PCS orders requiring relocation from Texas to Virginia (over 1,500 miles) within 30 days. *See* **Exhibit 1**.

11.     On June 21, 2025, Plaintiff entered into a purchase contract for a home in Virginia, financed through a VA-guaranteed loan originated and serviced by Defendant.

12.     The Department of Veterans Affairs, through its Loan Guaranty Service ("VA LGY"), administers the VA Home Loan Guaranty Program under 38 U.S.C. Chapter 37 and 38 C.F.R. § 36.4352. Pursuant to 38 U.S.C. § 501(a), the Secretary of Veterans Affairs is authorized to prescribe rules and regulations governing VA-guaranteed loans. Under that authority, the Department published the VA Lender's Handbook, which establishes the mandatory procedural and interpretive standards for VA-approved lenders participating in the program.

13.     Under VA loan policy, allowable closing costs and seller concessions are distinct. Allowable closing costs (e.g. appraisal, title, origination, recording) may be paid in any amount agreed between the seller and buyer. Seller concessions, by contrast, include additional incentives to the buyer, such as payment of the VA funding fee or consumer debts, and are limited to 4% of the home's value. VA loan policy further clarifies that "*seller concessions do not include payment of the buyer's closing costs…*". *See* **Exhibit 2**. Defendant conflated these categories by treating allowable closing costs as if subject to the four-percent cap.

14.     The June 21, 2025 purchase contract included $25,000 in seller credits, negotiated to cover both: (a) unlimited allowable closing costs, and (b) up to 4% in seller concessions

(including payment toward the VA funding fee and maximum credit card payment), consistent with VA Lenders Handbook, Ch. 8 § 5(d). *See* **Exhibit 3**.

### Defendant's VA-Lending Representations

15.    Before applying for the loan, Defendant's VA Loan website promoted itself as a *"Top VA Lender"* that "understands the unique needs of servicemembers, Veterans, and their families" and helps them "take advantage of exclusive VA loan benefits."

16.    The phrase *"Top VA Lender"* on Defendant's VA Loan webpage contained a hyperlink noting that *"Navy Federal Credit Union was included in 9 Best VA Lenders in 2025 by Money.com."* Plaintiff viewed this representation during May 2025. An archived version captured through the Internet Archive's Wayback Machine reflects the statements as they appeared at that time. *See* **Exhibit 4**.

17.    In an additional marketing feature titled *"Making Cents: Spotlight on VA Loans,"* Defendant stated: *"Navy Federal Credit Union is a Top VA Lender and can help you understand the process of using a VA loan from start to finish."* The website further stated *"Navy Federal's home-lending unit knows first-hand that many people—servicemembers and civilians alike—know little about the benefits of VA mortgages..."* Plaintiff viewed these webpages multiple times between May 8 and May 21, 2025, while researching lenders during her short-notice PCS relocation. These representations created a reasonable expectation that Defendant's employees possessed specialized expertise in VA-compliant lending practices from start to close. *See* **Exhibit 5**.

18.    The same websites stated: *"Seller Contribution of Up to 4% – The seller is allowed to contribute up to 4% of the value of the home toward your qualifying closing costs, which could save you money."* At the time Plaintiff viewed this statement, she believed it

accurately reflected VA loan policy because Defendant promoted itself as a "*Top VA Lender*" experienced with servicemember loans.

19.    The statement was false and misleading. In context, "up to 4%" would reasonably lead a borrower to believe that the seller could not contribute more than 4% toward total settlement costs, even though VA policy imposes no such limit on allowable closing costs. Plaintiff relied on this representation in selecting Defendant as her lender, expecting it to apply VA credit rules correctly. Defendant's inaccurate statement conveyed false expertise in VA lending and had the capacity to mislead other consumers in the same manner.

20.    As of October 24, 2025, Defendant's official website continues to advertise that "the seller is allowed to contribute up to 4% of the value of the home toward qualifying closing costs," without clarifying that VA policy imposes no such limit on allowable closing costs. The statement remains materially identical to the representation Plaintiff viewed prior to her loan application.[1]

### Loan Application and Misapplication of Seller Credits

21.    Prior to applying with Defendant, Plaintiff contacted other mortgage lenders to compare VA loan options but found that several representatives appeared uncertain or unfamiliar with VA-specific lending and military orders. Because Defendant advertised itself as a "Top VA Lender" that understood the unique needs of servicemembers, Plaintiff reasonably concluded that Defendant possessed superior expertise in administering VA-guaranteed loans. Relying on that representation, Plaintiff selected Defendant instead of other lenders she had contacted.

22.    On May 22, 2025, Plaintiff applied for a VA Home Loan with the Defendant. At the beginning of her loan process, Plaintiff informed Defendant that she was under short-notice

---

[1] *Navy Federal Credit Union*, *VA Loans*, https://www.navyfederal.org/loans-cards/mortgage/mortgage-rates/va-loans.html (last visited Oct. 24, 2025). "Up to 4%" wording on that date was substantially identical to the archived version captured May 18, 2025 (filed as Exhibit 4).

PCS orders and needed to close quickly to relocate her family. Plaintiff emphasized these time constraints and stated that she was relying on Defendant's advertised expertise with servicemember loans to ensure the transaction would be handled accurately and efficiently under VA policy. In May 2025 phone conversations, Defendant further assured Plaintiff that they uphold VA Lending Standards.

23.     On June 21, 2025, Defendant issued a written pre-approval letter. After receiving the pre-approval, Plaintiff confirmed that the seller in this transaction was willing to provide seller credits. Because Defendant advertised itself as a "Top VA Lender" and represented that sellers could contribute "up to 4 %" toward closing costs, Plaintiff sought to confirm that her proposed credit structure complied with VA requirements. Upon reviewing the VA Lender's Handbook, she learned that allowable closing costs are not subject to the 4 percent seller-concession cap. Based on that information, Plaintiff structured her purchase negotiations to lawfully maximize the seller credits in a manner that supported her family's financial stability during the imminent PCS relocation.

24.     Relying on Defendant's assurances and advertised VA-loan expertise, Plaintiff made an offer with the pre-approval letter and executed a purchase contract that same date. Plaintiff reasonably believed Defendant would apply VA policy correctly and structure the loan in accordance with VA guidelines. Plaintiff had not previously consulted the VA Lender's Handbook in connection with an earlier property, as the seller in that transaction declined to offer any closing cost assistance or credits. Plaintiff ultimately declined to proceed with that prior purchase due to the seller's refusal to provide closing assistance.

25.     Plaintiff uploaded the executed contract to the NFCU Home Squad Portal on June 22, 2025. In email correspondence on June 23, 2025, Plaintiff provided Defendant with the VA

Lender's Handbook identifying that allowable closing costs are not limited by a 4% seller-concession cap. In the email, Plaintiff clearly designated her $25,000 in seller credits for both allowable closing costs and 4% concessions (i.e. maximum credit card payment), consistent with VA policy. *See* **Exhibit 6**. Between June 23, 2025 and July 24, 2025, Defendant issued multiple Closing Disclosures ("CDs") containing material errors in the application of seller credits.

26.     Plaintiff repeatedly notified Defendant, both verbally and in e-mail correspondence, that the CDs misapplied VA policy by counting allowable closing costs against the 4% seller-concession cap. In correspondence dated July 3, 2025, Defendant stated that fees were just "non-balanced" and maintained that its treatment was correct. Defendant further explained that additional revised CDs would be published.

27.     On July 18, 2025, Defendant issued a revised CD and Settlement Statement misclassifying $6,862 of closing costs as buyer-paid, contrary to the purchase contract. If uncorrected, this would have required Plaintiff to bring $6,862 to closing on July 21, 2025. *See* **Exhibit 7**.

28.     The same date, Plaintiff contacted VA LGY, the federal office responsible for interpreting VA-guaranteed loan policy. In phone conversation, VA LGY confirmed that Defendant's interpretation was incorrect and that allowable closing costs are *not* subject to the 4% concession limit. VA LGY reiterated that a seller is allowed to pay both closing costs *and* 4% in concessions.

29.     In July 18, 2025 e-mail correspondence and phone conversation, Plaintiff immediately relayed VA LGY's clarification to Defendant and requested that the CD be corrected. Defendant continued to assert that "VA maximum seller concessions is 4%," and

refused to define the term "concession." *See* **Exhibit 8**. In phone conversation, Defendant falsely claimed "the VA" had reviewed and approved its interpretation.

30.     On July 21, 2025, Plaintiff requested the name and contact information of the VA representative Defendant claimed to have consulted. Despite multiple phone and email communications, Defendant refused to provide any documentation or point of contact. *See* **Exhibit 9**.

31.     On July 21, 2025, Plaintiff also contacted Defendant by phone and email, restating the relevant VA Handbook provisions and reiterating VA LGY's confirmation that allowable closing costs are not subject to the 4% concession limit. Defendant failed to address the specific issue, repeated only a generalized statement that "concessions are up to 4% of the loan," and again insisted there were no errors in the seller-credit application.

32.     Facing imminent relocation under PCS orders and with no alternative housing or time to restart financing with another lender, Plaintiff was entirely dependent on Defendant's approval to complete the transaction. Defendant was fully aware of Plaintiff's time constraints and the urgency of her relocation. Despite repeated notice of its error, Defendant maintained its interpretation of VA policy and refused to correct the CD, effectively using its control over loan approval to dictate the outcome. Plaintiff had no meaningful choice but to rely on Defendant's interpretation and renegotiate the purchase contract.

33.     On July 21, 2025, Plaintiff renegotiated the contract to avoid paying the misallocated $6,862 at closing. The renegotiation reduced seller credits from $25,000 to $12,000, eliminating $13,000 that had been expressly negotiated to pay the VA funding fee and maximum credit card payment. *See* **Exhibit 3**.

**Resulting Harm and Post-Closing Notice**

-8-

34.     Although the renegotiation reduced the purchase price, it did not restore the intended financial benefit of applying the full $25,000 in seller credits to both allowable closing costs and 4% concessions. Plaintiff structured the transaction to meet her family's immediate financial obligations during PCS relocation by applying seller credits toward allowable closing costs, the maximum authorized credit-card paydown, and the VA funding fee. This structure, fully compliant with VA loan policy, was intended to reduce existing debt and preserve family stability without exceeding permissible credit limits. Defendant's misapplication of VA rules dismantled that structure, forcing the $10,626 VA funding fee into the loan principal and depriving Plaintiff of the debt relief she lawfully negotiated. *See* **Exhibit 10**.

35.     Defendant's refusal to correct its error during Plaintiff's relocation caused significant stress and anxiety while she attempted to secure housing for her family under short-notice PCS orders. The mishandling also delayed closing from July 21 to July 24, 2025, after Plaintiff's Temporary Lodging Entitlement (TLE) had expired, resulting in $384.21 in additional hotel expenses charged to her household credit card. *See* **Exhibits 3, 11**.

36.     Furthermore, Defendant issued a revised CD reflecting altered credit and fee allocations less than two hours before the rescheduled closing appointment on July 24, 2025. *See* **Exhibit 12(A-C)**. This last-minute change deprived Plaintiff of the legally required three-day TILA review period and any meaningful opportunity to dispute the errors. The timing of the disclosure was contrary to 12 U.S.C. § 2603(a) and 15 U.S.C. § 1638(a)(2)(A), (a)(5), (b)(1) and demonstrated Defendant's disregard for compliance standards.

37.     On August 7, 2025, Plaintiff submitted a formal written complaint to Defendant, identifying its misapplication of VA seller-credit policy, detailing the resulting financial harm, and demanding corrective action and reimbursement. The complaint enclosed written

-9-

confirmations from VA LGY dated July 23 and August 1, 2025, each expressly reaffirming that Defendant's interpretation of VA seller-credit rules was incorrect. *See* **Exhibit 13**. Defendant acknowledged receipt of Plaintiff's complaint but failed to take corrective action, provide reimbursement, or offer any substantive resolution. Between August 7 and September 15, 2025, Defendant's email correspondence repeatedly stated that the issue was "under review," with no indication that any corrective measures were implemented.

38.     After Defendant failed to act, Plaintiff filed related complaints with the Consumer Financial Protection Bureau ("CFPB") on September 16, 2025, and the VA LGY on September 17, 2025, to report Defendant's continued misapplication of VA loan policy. These filings provided further formal notice of Defendant's conduct and its broader impact on VA borrowers.

39.     In her September 17, 2025 complaint to VA LGY, Plaintiff requested an audit of Defendant's processing of her VA-guaranteed loan. Following that request, VA LGY conducted a preliminary review. During an October 2025 follow-up call, a VA LGY representative informed Plaintiff that discrepancies were found in Defendant's application of seller credits toward allowable closing costs and concessions. Upon information and belief, VA LGY subsequently issued a formal discrepancy notice to Defendant, which remains unanswered.

40.     After closing, Plaintiff learned that other veterans had experienced the same misapplication by Defendant. A realtor publicly described a similar VA-loan dispute with Defendant and referred Plaintiff to a supervisory employee within Defendant's mortgage-origination department. In written correspondence dated September 9, 2025, the supervisory employee acknowledged that Defendant had been misapplying VA seller-credit guidelines on multiple VA loans and stated that internal guideline adjustments and corrective actions were necessary to comply with VA lending regulations.

## CAUSES OF ACTION

## COUNT I – Violation of the Virginia Consumer Protection Act (Va. Code §§ 59.1-200, 59.1-204)

41.     Plaintiff realleges and incorporates paragraphs 1–40 as if fully set forth herein.

42.     Defendant engaged in deceptive acts and practices in violation of Va. Code § 59.1-200(A)(5), (6), and (14) by publicly advertising its VA-lending expertise with statements that misled reasonable consumers about both its compliance with VA-loan standards and the four-percent seller-concession limitation under the VA Lender's Handbook Ch. 8 § 5(d).

43.     Defendant acted as a supplier within the meaning of Va. Code § 59.1-198 because it advertises and provides mortgage-lending services to individual consumers in Virginia. Plaintiff qualifies as a consumer within the meaning of Va. Code § 59.1-198 because she sought Defendant's services for a personal residence used for "personal, family, or household purposes." The conduct at issue constitutes a consumer transaction under that statute, involving the advertising of mortgage-lending services to be used for personal, family, or household purposes.

44.     Defendant's webpage operated as a commercial solicitation to the general public, not as a component of a credit transaction. Before any loan application, Defendant promoted itself to the public through webpages titled "VA Loans" and "Making Cents: Spotlight on VA Loans," inviting servicemembers and veterans to apply for VA-guaranteed mortgages. *See* **Exhibits 4-5**. The advertisements stated:

> (a) *"We're a Top VA Lender that understands the unique needs of servicemembers, Veterans, and their families."*

      (b) *"Navy Federal Credit Union is a Top VA Lender and can help you understand the process of using a VA loan from start to finish."*

      (c) *"Seller Contribution of Up to 4% – The seller is allowed to contribute up to 4% of the value of the home toward your qualifying closing costs."*

45.      The phrase "Top VA Lender" contained a linked superscript stating, *"Navy Federal Credit Union was included in 9 Best VA Lenders in 2025 by Money.com."* Defendant presented "Top VA Lender" as a factual ranking and representation of expertise. Defendant additionally presented the "Up to 4%" statement as an authoritative summary of federal VA lending policy. By these statements, Defendant represented itself as a VA-loan expert and falsely claimed that federal policy restricts seller contributions to four percent of the home's value.

46.      In fact, under the VA Lender's Handbook Ch. 8 § 5(d), allowable closing costs are not limited by the four-percent seller-concession cap. By promoting this false limitation while marketing itself as a "Top VA Lender," Defendant created a misleading impression of regulatory expertise and compliance. The statements were material because they invited reliance by borrowers seeking accurate information about VA-loan benefits and compliance.

47.      These public marketing solicitations were not federally regulated loan disclosures or banking operations and fall outside the exemption in Va. Code § 59.1-199. The stated advertisements were not reviewed or required by any federal regulator and existed solely to attract potential borrowers. Defendant's conduct violated Va. Code § 59.1-200(A)(5), (6), and (14) by making false and misleading representations about the nature and characteristics of its services.

48.      Defendant knew or should have known that its statements were false. After Plaintiff provided the correct VA Handbook provisions and written confirmations from VA

-12-

LGY, Defendant continued to display and promote the same misstatements, a willful violation under Va. Code §59.1-204(A). *See* **Exhibits 6, 13**.

49.     Plaintiff viewed and relied on Defendant's marketing when selecting Defendant as her lender, reasonably believing its VA-loan practices complied with federal standards. The misrepresentations induced her to apply for financing through Defendant instead of another lender she otherwise would have chosen. This reliance directly caused foreseeable, measurable losses, including (a) $13,000 in forfeited seller credits, (b) a $10,626 VA funding fee added to the loan principal with increased lifetime interest, and (c) $384.21 in lodging expenses from the delayed closing. These amounts are ascertainable within the meaning of Va. Code § 59.1-204(A).

50.     Pursuant to Va. Code § 59.1-204(A)-(B), Plaintiff seeks actual damages, treble damages for willful violations, reasonable attorney's fees, costs, and such further relief as the Court deems just and proper.

### COUNT II – Actual Fraud / Intentional Misrepresentation (Virginia Common Law; Punitive Damages under Va. Code § 8.01-38.1)

51.     Plaintiff incorporates paragraphs 1–40 as if fully set forth herein.

52.     Between June 23, 2025 and July 24, 2025, Defendant's loan officers and supervisors represented to Plaintiff by phone and e-mail correspondence that (a) allowable closing costs were subject to the 4 percent seller-concession cap and (b) the Department of Veterans Affairs had approved or confirmed that interpretation.

53.     These statements were false. Plaintiff independently reviewed the VA Lender's Handbook to ensure her negotiated seller credits complied with VA requirements and confirmed that allowable closing costs are *not* subject to the four-percent cap. When she provided

Defendant with that guidance, Defendant repeated the same misleading statements, omitted the distinction between concessions and closing costs, and falsely claimed that its interpretation had VA approval despite multiple VA LGY communications to the contrary. This repetition shows intent to mislead.

54.     Defendant knew, or recklessly disregarded, that under the VA Lender's Handbook Ch. 8 § 5(d) the four-percent limitation applies only to seller-paid concessions, not to allowable closing costs. Despite that knowledge, Defendant deliberately applied the cap to Plaintiff's transaction in violation of VA loan policy.

55.     Because Defendant exercised exclusive authority over loan approval and closing, and continued to process the transaction only under its own interpretation, Plaintiff had no ability to correct the misapplication. Under PCS duress and without alternative housing, she was compelled to renegotiate the contract to avoid paying $6,862 at closing. Defendant's false representations and misuse of its control directly caused that modification. Plaintiff's reliance was reasonable given Defendant's control.

56.     As a direct and proximate result, Plaintiff lost $13,000 in negotiated seller credits, was forced to finance a $10,626 VA funding fee (increasing lifetime interest), and incurred $384.21 in hotel expenses from the delayed closing.

57.     Defendant's willful and reckless conduct caused Plaintiff significant emotional distress, including anxiety, loss of sleep, and mental anguish. The distress was heightened by Plaintiff's PCS orders, which required her to relocate over 1,500 miles with her family on short notice. As the household's primary breadwinner and decision-maker, Plaintiff bore sole responsibility for securing housing and completing the relocation. Defendant's refusal to correct its error forced Plaintiff to navigate housing instability, financial uncertainty, and the risk of

homelessness for her family under extreme time pressure, causing substantial turmoil and emotional hardship.

58.    Defendant's conduct was willful and wanton, justifying punitive damages under Va. Code § 8.01-38.1.

### COUNT III – Constructive Fraud / Negligent Misrepresentation

*(Virginia Common Law; Pled in the Alternative to Count II)*

59.    Plaintiff incorporates paragraphs 1–40 as if fully set forth herein.

60.    In the alternative to Count II, Defendant made false representations of material fact regarding the treatment of seller credits and allowable closing costs under VA loan policy. These representations included statements that all such costs were subject to the four-percent seller-concession cap and that Defendant's interpretation was approved by the Department of Veterans Affairs.

61.    Defendant made these representations negligently, without intent to deceive. Defendant failed to exercise reasonable care to verify their accuracy before communicating them to Plaintiff, despite a duty under 38 C.F.R. § 36.4352 to originate and close VA-guaranteed loans in compliance with VA standards.

62.    Plaintiff reasonably relied on these statements in proceeding with her home purchase and renegotiating the sales contract while under short-notice PCS orders.

63.    As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff suffered financial losses including $13,000 in lost seller credits, forced financing of the $10,626 VA funding fee with increased lifetime interest, and $384.21 in temporary-lodging expenses, together with accompanying stress and disruption to her family relocation.

64.     These losses have caused Plaintiff continuing financial and emotional harm, including anxiety and disruption of family stability during PCS relocation. Plaintiff seeks compensatory damages for all economic and non-economic injuries proximately caused by Defendant's constructive fraud.

## COUNT IV – Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing (Virginia Common Law)

65.     Plaintiff incorporates paragraphs 1–40 as if fully set forth herein.

66.     Plaintiff and Defendant entered into a contractual relationship governing the origination and processing of Plaintiff's VA-guaranteed mortgage loan. This relationship was established through Defendant's acceptance of Plaintiff's completed loan application, issuance of a pre-approval letter, and collection of required credit-report and appraisal fees. Defendant thereafter issued CDs and other loan documents in the course of performance. Defendant agreed, expressly and by necessary implication, to originate and close the loan in compliance with VA-loan standards and applicable federal lending laws. These mutual obligations, supported by Plaintiff's payment of fees and reliance on Defendant's promised expertise, constituted a valid and enforceable contract under Virginia law.

67.     Defendant breached its contractual duties by:

(a) misapplying the VA four-percent seller-concession cap to allowable closing costs;

(b) issuing inaccurate disclosures that reclassified $6,862 in seller-paid costs as borrower-paid on the July 18, 2025 CD; and

(c) ignoring written notice and confirmation from VA LGY that its interpretation of VA policy was incorrect.

-16-

68.     Each act constitutes a material breach of Defendant's contractual duties.

69.     As a result of Defendant's misapplication of VA policy, Plaintiff was compelled to execute a purchase-contract addendum on July 21, 2025, expressly stating that the revision was made "due to Navy Federal capping all seller credits, including closing costs, at 4%."

70.     Defendant's refusal to correct its error forced Plaintiff to proceed under PCS duress with unfavorable terms that undermined the intended benefit of the transaction. The coerced contract revision eliminated $13,000 in negotiated seller credits that had been specifically allocated to pay down Plaintiff's existing credit-card balances and cover the VA funding fee, uses expressly permitted under VA policy. As a result, those debts remained outstanding, the $10,626 funding fee was rolled into the loan principal, and the overall financial structure of the transaction was materially altered to Plaintiff's detriment.

71.     Defendant breached the implied covenant of good faith and fair dealing by refusing to correct its error after notice, exploiting Plaintiff's PCS deadline, and using its control over loan approval to coerce acceptance of inaccurate VA lending guidelines.

72.     As a direct and foreseeable result, Plaintiff incurred $13,000 in lost seller credits, $10,626 in unnecessary financed principal, and $384.21 in lodging expenses caused by the delayed closing.

73.     Defendant's conduct lacked good faith within the meaning of Restatement (Second) of Contracts § 205. Accordingly, Defendant breached both express and implied contractual duties. Plaintiff seeks compensatory damages and all other relief available at law and in equity.

**COUNT V – Violation of the Real Estate Settlement Procedures Act (12 U.S.C. §**
**2605; 12 C.F.R. § 1024.35)**

74.     Plaintiff incorporates paragraphs 1–40 as if fully set forth herein.

75.     Defendant both originated and serviced Plaintiff's VA-guaranteed mortgage loan,
making it a "servicer" of a "federally related mortgage loan" within the meaning of 12 U.S.C. §
2605(i)(2)–(3) and 12 C.F.R. § 1024.2(b). Accordingly, Defendant is subject to RESPA's
obligations to provide accurate disclosures and to investigate and correct servicing errors.

76.     The July 18, 2025 ALTA Settlement Statement issued by Defendant misclassified
$6,862 in allowable seller-paid closing costs as borrower-paid, reflecting a servicing and
accounting error under 12 C.F.R. § 1024.35(b)(11).

77.     12 U.S.C. § 2605(e)(1)(B), (e)(2), and (k)(1)(C) and 12 C.F.R. § 1024.35 require
servicers to investigate and correct such errors; Defendant failed to do so.

78.     On August 7, 2025, Plaintiff submitted a detailed written complaint directly to
Defendant identifying her loan, describing Defendant's misapplication of VA seller-credit
policy, explaining the resulting financial harm, and requesting correction and reimbursement.
This correspondence constituted a "qualified written request" and notice of error within the
meaning of 12 U.S.C. § 2605(e)(1)(B) and 12 C.F.R. § 1024.35.

79.     Defendant acknowledged receipt but failed to conduct a reasonable investigation
or provide a written explanation satisfying 12 U.S.C. § 2605(e)(2). Defendant's only
communications were statements that the matter was "under review," without findings,
corrective action, or supporting documentation. Such responses did not constitute a substantive
response under RESPA or Regulation X and violated 12 U.S.C. § 2605(e)(2).

80.      Defendant also violated 12 U.S.C. § 2605(e)(4), which limits the time a servicer may take to respond to a borrower's written notice of error. The statute requires a written response within 30 days of receipt and permits a single 15-day extension only if the servicer notifies the borrower before the initial 30-day period expires and explains the reason for the delay. As of October 24, 2025, Plaintiff has not received any official answer to the specific concerns listed in her 7 August inquiry. Defendant failed to provide any extension notice within those statutory deadlines, thereby violating § 2605(e)(4).

81.      As a direct and proximate result of these violations, Plaintiff incurred economic harm, including (1) loss of $13,000 in negotiated seller credits; (2) forced financing of the $10,626 VA funding fee, resulting in increased principal and lifetime interest; and (3) $384.21 in hotel expenses due to delayed closing.

82.      Pursuant to 12 U.S.C. § 2605(f)(1)(A)–(B),(3), Plaintiff seeks actual damages, statutory damages for Defendant's pattern or practice of noncompliance, reasonable attorney's fees, and costs.

**COUNT VI – Violation of the Truth in Lending Act and Regulation Z (15 U.S.C. §§ 1638, 1640; 12 C.F.R. § 1026.19)**

83.      Plaintiff incorporates paragraphs 1–40 as if fully set forth herein.

84.      Defendant was the originating creditor for Plaintiff's VA-guaranteed mortgage loan, as the obligation was initially payable to Defendant. Defendant is a "creditor" within the meaning of 15 U.S.C. § 1602(g) and 12 C.F.R. § 1026.2(a)(17), subject to TILA and Regulation Z's disclosure and timing requirements.

85.      Under 15 U.S.C. § 1638(a)(2)(A) and (a)(5), a creditor must clearly disclose the "amount financed" and the "finance charge." Defendant's July 18 2025 Closing Disclosure

("CD") misstated both figures by reclassifying $6,862 in seller-paid closing costs as borrower-paid. This misclassification increased the stated amount financed and finance charge beyond the true cost of credit. This misstatement violated 15 U.S.C. §1638(a)(2)(A) and (a)(5).

86.     15 U.S.C. § 1638(a)(17) requires a creditor to disclose, for residential mortgage loans, the aggregate amount of settlement charges, identifying which charges are financed and which are payable at closing. Defendant failed to make these disclosures accurately. Its July 18, 2025 CD omitted the aggregate seller-paid amounts and falsely presented them as borrower obligations, concealing the true settlement-cost allocation.

87.     Under 15 U.S.C. § 1638(b)(1) and 12 C.F.R. § 1026.19(f)(1)(ii), the creditor must deliver the final CD not later than three business days before consummation. Defendant issued a materially revised CD less than two hours before the July 24, 2025 closing, depriving Plaintiff of the mandatory three-day review period. This timing violation prevented Plaintiff from any meaningful opportunity to review loan terms.

88.     Defendant's violations of § 1638(a)(2)(A), (a)(5), (a)(17), and (b)(1) rendered the disclosures inaccurate and misleading, defeating TILA's purpose of enabling consumers to compare credit terms and understand total loan costs. As a result, Plaintiff was forced to finance the $10,626 VA funding fee into principal, pay additional lifetime interest, and incur $384.21 in relocation lodging expenses.

89.     Defendant's conduct reflects a pattern of misapplication of VA seller-credit rules affecting multiple borrowers, as acknowledged by an NFCU supervisor. This pattern supports statutory damages under 15 U.S.C. §1640(a)(2)(A).

90.     Pursuant to 15 U.S.C. § 1640(a)(1)–(3), Plaintiff seeks actual damages for these losses, statutory damages, and reasonable attorney's fees and costs.

-20-

**COUNT VII – Violation of the Equal Credit Opportunity Act and Regulation B (15 U.S.C. § 1691(d); 12 C.F.R. § 1002.2(c))**

91.    Plaintiff incorporates paragraphs 1–40 as if fully set forth herein.

92.    ECOA and Regulation B prohibit a creditor from taking an adverse action on a credit application without written notice stating specific reasons. 15 U.S.C. § 1691(d)(2); 12 C.F.R. § 1002.2(c)(1)(ii).

93.    Defendant materially changed the terms of Plaintiff's VA-guaranteed mortgage by reclassifying allowable seller credits as buyer-paid costs and refusing to apply the negotiated $25,000 in credits as required by the purchase contract. This unilateral change reduced the amount of credit extended for settlement costs and credit card paydown, increased the financed principal, and altered the cost of credit.

94.    Defendant's conduct constituted an "adverse action" under 15 U.S.C. § 1691(d)(2) and 12 C.F.R. § 1002.2(c)(1)(ii) because it was a change in the terms of credit not requested by the applicant and unfavorable to the borrower.

95.    Although Plaintiff executed a contract addendum reducing seller credits, the modification was made solely to prevent an immediate closing failure caused by Defendant's misapplication of VA policy. Plaintiff had no meaningful choice, acted under PCS duress, and did not request or initiate any change in loan terms. Defendant's coercive conduct does not qualify for the "at the applicant's request" exclusion under § 1002.2(c)(2)(i).

96.    Defendant failed to provide the written notice of adverse action required by 15 U.S.C. § 1691(d)(2), depriving Plaintiff of the opportunity to receive or contest the stated reasons for the change.

97.     As a direct and proximate result, Plaintiff suffered actual damages including (a) loss of $13,000 in seller credits; (b) forced financing of the $10,626 VA funding fee, increasing principal and lifetime interest costs; and (c) $384.21 in hotel expenses due to the delayed closing.

98.     Pursuant to 15 U.S.C. § 1691e(a)–(d), Plaintiff seeks actual, punitive, and statutory damages, plus attorney's fees and costs.

## COUNT VIII – Declaratory Relief (28 U.S.C. §§ 2201–2202)

99.     Plaintiff incorporates paragraphs 1–40.

100.    An actual and justiciable controversy exists under 28 U.S.C. § 2201 concerning Defendant's interpretation and application of federal statutes and regulations governing VA-guaranteed mortgage loans and mandatory disclosure obligations.

101.    The controlling authorities include:

(a) 38 U.S.C. § 3703(c), authorizing the Secretary of Veterans Affairs to guarantee loans made by approved lenders and conditioning that authority on lender compliance with regulations and procedures prescribed by the Secretary;

(b) 38 U.S.C. § 501(a) and 38 C.F.R. § 36.4352, requiring lenders operating under VA automatic authority to originate and close loans in strict accordance with regulations and standards issued by the Secretary, including VA Pamphlet 26-7 (VA Lender's Handbook); and

(c) 12 U.S.C. § 2603(a)  and 15 U.S.C. § 1638(a)(2)(A), (a)(5), (a)(17) *(as implemented by the Consumer Financial Protection Bureau's Regulation X, 12 C.F.R. Part 1024, and Regulation Z, 12 C.F.R. Part 1026)*, which require accurate disclosure of settlement-cost and financing information.

102.    Plaintiff seeks a declaratory judgment under 28 U.S.C. § 2201 that:

(a) Under VA Pamphlet 26-7, Ch. 8 § 5(d), allowable closing costs are not subject to the four-percent seller-concession cap; Defendant's contrary treatment of seller credits violated the governing VA-lending regulations, as properly construed by the Secretary's published guidance;

(b) By misclassifying allowable closing costs and issuing inaccurate disclosures, Defendant failed to comply with the above-referenced statutes and regulations governing VA-guaranteed loans and federally related mortgage disclosures; and

(c) Defendant's continued use of that interpretation constitutes an ongoing violation of federal lending standards and VA program rules. This ongoing conduct warrants prospective declaratory relief under 28 U.S.C. § 2201.

103.    Pursuant to 28 U.S.C. § 2202, Plaintiff seeks equitable relief directing Defendant to implement corrective training and policy measures to ensure future compliance with VA seller-credit rules.

## RESERVATION OF RIGHTS

104.    Plaintiff believes the conduct described herein reflects a broader pattern of misrepresentation in Defendant's VA loan origination and closing practices affecting multiple veterans. Plaintiff reserves all rights to amend this complaint, upon discovery of additional facts, to assert claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., or other applicable statutes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and

award the following relief:

### I. Compensatory and Actual Damages

A.  Actual damages including, but not limited to:
    (1)  $13,000 in lost seller credits;
    (2)  $10,626 in the VA funding fee improperly financed into the loan;
    (3)  $384.21 in temporary lodging expenses due to delayed closing;
    (4)  the resulting increase in lifetime interest; and
    (5)  any additional actual damages proven at trial.

B.  Compensatory damages for Defendant's breach of contract and breach of the implied covenant of good faith and fair dealing, in amounts to be determined at trial.

C.  Compensatory damages for Defendant's negligent or constructive misrepresentation under Virginia common law, in amounts to be determined at trial.

D.  Compensatory damages for emotional distress and mental anguish arising from Defendant's willful and reckless conduct, including the turmoil and anxiety caused by Plaintiff's forced contract renegotiation during short-notice PCS relocation, in amounts to be determined at trial.

### II. Statutory and Enhanced Damages

E.  Treble damages for willful violations of the Virginia Consumer Protection Act, Va. Code § 59.1-204(A).

F.  Statutory damages under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(f), for Defendant's pattern or practice of noncompliance, and under the Truth in Lending Act, 15 U.S.C. § 1640(a), for Defendant's material disclosure violations.

G.  Actual, statutory, and punitive damages for Defendant's violations of the Equal Credit Opportunity Act, pursuant to 15 U.S.C. § 1691e(a)–(d).

H.  Punitive damages for fraud and intentional misrepresentation under Va. Code § 8.01-38.1, in an amount sufficient to punish and deter similar conduct.

### III. Declaratory and Equitable Relief

I.  Declaratory relief under 28 U.S.C. §§ 2201–2202, declaring that Defendant's misapplication of VA seller-credit rules and misrepresentation of allowable closing costs violated Plaintiff's rights and the governing federal and VA lending laws.

J.  Grant equitable relief under 28 U.S.C. § 2202 directing Defendant to implement corrective training, revise internal lending policies, and ensure compliance with VA Pamphlet 26-7 (VA Lender's Handbook) and federal disclosure requirements in all VA-guaranteed loan transactions.

## IV. Additional Relief

K.  Pre-judgment and post-judgment interest as allowed by law.

L.  Court costs, including filing, service, and transcript fees, pursuant to Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920.

M.  Reasonable attorney's fees and costs under applicable statutes, including Va. Code § 59.1-204(B); 12 U.S.C. § 2605(f)(3); 15 U.S.C. § 1640(a)(3); and 15 U.S.C. § 1691e(d).

N.  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Natasha N. Bennett
Plaintiff, Pro Se
6301 Stevenson Ave, Unit 602
Alexandria, VA  22304
Phone: (337) 353-7503
Email: nbennett001@yahoo.com

Date: 28 October 2025

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
_____ALEXANDRIA_____DIVISION

Natasha Nicole Bennett
_____
        **Plaintiff(s),**

        v.

Civil Action Number: _1:25cv1896_

Navy Federal Credit Union
_____
        **Defendant(s),**

## LOCAL RULE 83.1 (N) CERTIFICATION

I declare under penalty of perjury that:

Civil Complaint, 86 Pages [13 Exhibits]

No attorney has prepared or assisted in the preparation of _(Bennett vs Navy Federal Credit Union)_.
                                                    **(Title of Document)**

Natasha Nicole Bennett
_____
Name of *Pro Se* Party (Print or Type)

_____
 Signature of *Pro Se* Party

Executed on: 28 OCT 2025 (Date)

                        **OR**

The following attorney(s) prepared or assisted me in preparation of _____.
                                                    **(Title of Document)**


_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document.

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____(Date)